# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 0:16-cv-01661-SRN-KMM |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION** |
| Thomas Jensen, | |
| Respondent. | |

Erin M. Secord, Esq., Assistant United States Attorney, counsel for the government

Lisa M. Lopez, Esq., Assistant Federal Defender, counsel for Thomas Jensen

## I.  Introduction

Thomas Jensen is currently in the custody of the United States Attorney General, ECF No. 1-2, though the term of imprisonment imposed under his criminal sentence has expired.  The government filed a Petition, pursuant to 18 U.S.C. § 4246, asking the Court to find that Mr. Jensen should not be released because he presently suffers from a mental disease or defect, and as a result, his release would create a substantial risk of bodily injury to others.  Pet., ECF No. 1.  The government seeks an order committing Mr. Jensen to the custody of the Attorney General for continued hospitalization and treatment until suitable state placement may be found or until Mr. Jensen's release no longer poses a safety risk.  *Id.*  Mr. Jensen opposes the government's Petition.

On October 14, 2016, the Court held an evidentiary hearing on the government's Petition at the Federal Medical Center in Rochester, Minnesota ("FMC Rochester"), where Mr. Jensen is housed.  ECF No. 15.  Two expert witnesses, Dr. Jason E. Gabel and Dr. Shelly R. Stanton, testified on behalf of the government.  Elizabeth Meyer, a Licensed Social Worker, also testified for the government regarding state placement options in Mr. Jensen's home state of South Dakota.  Although Mr. Jensen was present at the hearing, he did not testify.  However,

Dr. James H. Gilbertson provided expert testimony on Mr. Jensen's behalf. And, pursuant to the parties' stipulation, the Court received several exhibits into evidence.[1]

Under the relevant statutory scheme, the government is required to meet a heavy burden when it seeks to prolong a person's detention beyond the end of his sentence. The central question in this case is whether Mr. Jensen's release creates a substantial risk of bodily injury to others. Although this is a difficult case, the government has met its burden with respect to Mr. Jensen and the Court recommends that the Petition be granted. *See* 28 U.S.C. § 636 (authorizing proposed findings of fact, conclusions of law, and recommended dispositions); D. Minn. LR 72.1 (same).

## II.    Background

Mr. Jensen is forty-one years old. He was born in Pine Ridge, South Dakota. Ex. 6, Risk Assessment (hereafter "Risk Assessment") at PDS000387. Mr. Jensen was to be released from the custody of the Bureau of Prisons ("BOP") on June 2, 2016, at the end of a prison term imposed in 2014 following a violation of supervised release conditions. *Id.* But he was not released as scheduled. Instead, before his prison term expired, he was transferred to FMC Rochester "for a formal threat assessment for risk of dangerousness upon release from prison due to his verbalizing intent to abscond from supervision and 'hurt people' when released." *Id.*

A Risk Panel at FMC Rochester reviewed Mr. Jensen's mental health issues, his criminal history, his personal background, and his prison disciplinary record as part of the risk assessment. They also applied a risk assessment tool and interviewed Mr. Jensen. The panel ultimately opined that Mr. Jensen's release would create a

---

[1]    In this report and recommendation, the Court cites to the transcript of the October 14, 2016 evidentiary hearing held at the Federal Medical Center in Rochester, Minnesota ("FMC-Rochester") using the abbreviation "Tr." *See* ECF No. 18, Tr. of Oct. 14, 2016 Hr'g ("Tr."). At the hearing, the Court received a binder with the parties' pre-marked joint exhibits, which includes specific portions of the record that were highlighted at the hearing. The Court refers to these exhibits by the numbers assigned. *E.g.*, "Ex. 6, Risk Assessment." Finally, the Court received a compact disc containing an omnibus "Exhibit A," which includes Mr. Jensen's medical record (FMCR 000001-1798), his BOP Central File (CF000001-688), psychological services records (PDS000001-432), and numbered Exhibits 51, 52, and 53. The Court cites to evidence on the disc by reference to Exhibit A, and the Bates stamp associated with each page from these records.

substantial risk of bodily injury to another person due to his mental disease or defect. *Id.* at PDS000424-32.[2]

### A. Criminal Sentences and Supervised Release Revocations

Mr. Jensen has a troubled past, which includes many contacts with law enforcement and the criminal justice system that are relevant to the question before the Court. Before he was ever convicted of a federal offense, his legal history included three separate offenses for driving while impaired, a charge of reckless driving, and another for possession of marijuana. Ex. 30 at FMCR000338; Risk Assessment at PDS000406. He also had tribal arrests including "approximately 30 public intoxication offenses" prior to coming to federal court for the first time. Risk Assessment at PDS000406.

In 2004, Mr. Jensen was convicted of assaulting a federal officer during a 2003 incident at his home, and he was sentenced to a thirty-six month prison term followed by three years of supervised release.[3] Risk Assessment at PDS000402. In 2007, while he was out on supervised release, he violated his supervision conditions, in relevant part, by having inappropriate contact with his public defender and leaving threatening voicemail messages on his probation officer's phone. *Id.* at PDS000402-403. At that time, Mr. Jensen was residing at Community Alternatives of the Black Hills, a halfway house community placement. Tr. 70:8-25; *see also* Risk Assessment at PDS000403. Mr. Jensen had previously been instructed to cease contact with his former public defender due to inappropriate communications. After running into her at a Walmart during a trip scheduled by his halfway house, he left her a threatening voicemail, and

---

[2] It is possible that this commitment proceeding could have been avoided had more been done to address Mr. Jensen's mental health issues proactively. As Dr. Gabel testified at the hearing:

> The Panel members did agree, in our conversation, and this was something that was shared with Mr. Jensen, that we viewed it as unfortunate that we did not get to know Mr. Jensen earlier. We wished he would have been sent to us so we would have had more time to work with him and maybe could have worked on avoiding what brings us all here today.

Tr. 110:23-111:4.

[3] The facts of his offense are further explored at section III.B, below.

later wrote inappropriate letters to her and her husband. Tr. 70:21-25; Risk Assessment at PDS000403. His probation officer counseled him about the impropriety of such conduct and refused to give him a travel pass as a sanction. In response Mr. Jensen left his probation officer a threatening voicemail relating to her children, and he later wrote an inappropriate letter to her husband. *Id.* at PDS000402-403. His supervised release was soon revoked, and he was sentenced to eighteen months imprisonment, followed by another eighteen months of supervised release. *Id.* at PDS000402.

The threatening voicemail messages Mr. Jensen left with the probation officer also led to new criminal charges in 2008. Risk Assessment at PDS000404. In 2010, he pleaded guilty to sending threatening communications to a federal officer, and he was sentenced to ninety-six months in prison followed by three years of supervised release. *Id.*

Mr. Jensen was released from prison in May 2013. Unfortunately, it was not long before a court again found that he violated the terms of his supervised release. This occurred when he failed to comply with programming at Glory House, the residential treatment facility where he was staying. Tr. 50:10-13. Mr. Jensen also threatened to shoot members of the Glory House staff. Risk Assessment at PDS000404-405; *see also* Exs. 4 & 5. And he had a sharpened butter knife hidden in his property while at Glory House. Tr. 226:5-7.

Mr. Jensen's supervised release was revoked in November 2013, and he was again sentenced to two prison terms: one of twelve months, with no supervision to follow; and a second of twenty-four months, followed by twelve months of supervised release. Risk Assessment at PDS000405. The district court imposed the two sentences to run consecutively. *United States v. Jensen*, 583 F. App'x 558, 558 (8th Cir. 2014) (per curiam). Mr. Jensen had nearly completed the three-year period of incarceration when he was transferred to FMC Rochester for the risk assessment that led to this action.

### B. BOP Incident Reports

Mr. Jensen has been in custody for much of the last fifteen years. During this time, he has earned numerous incident reports for violating institutional disciplinary rules. Some of these incident reports involved the same threatening conduct that he had engaged in with his attorney and probation officer. *Compare* Risk Assessment PDS000402-404 (describing conduct leading to 2008 indictment), *with* Ex. 3, Inmate Discipline Data at CF000600 ("Made threat like statements in letter to USPO. Had

4

been previously ordered to have no contact."). These violations are the most relevant to the Court's analysis.

In September 2007, Mr. Jensen received an incident report for "fighting with another person," specifically another inmate located at the Federal Correction Institution in Englewood ("FCI Englewood").[4] Ex. 3 at CF000600; *see also* CF000479-481. As a result of the fight, Mr. Jensen lost good conduct time, spent one month in disciplinary segregation, and lost a month of other privileges. Ex. 3 at PDS000600. A note in Mr. Jensen's central file states: "Jensen be [sic] transferred to another institution which is commensurate with his security and separation concerns." Ex. A at CF000481. An investigation into the incident showed the other inmate went to Mr. Jensen's housing unit at FCI Englewood, where the other inmate was not permitted to go, and confronted Mr. Jensen, leading to the fight. Tr. 57:13-58:25; *id.* at 146:13-24.

Between 2008 and 2010, Mr. Jensen was held in the Pennington County Jail following his arrest for making threats to his probation officer, and he received thirty-two separate behavioral incident reports during that time. Risk Assessment at PDS000406. He violated rules prohibiting possession of contraband, disobeying staff orders, being disrespectful, and cheeking medications. *Id.* However, he was also disciplined on multiple occasions for "threatening staff," and causing damage to property. *Id.*

In October 2012, Mr. Jensen was being held at the Federal Transfer Center in Oklahoma City ("FTC Oklahoma City"). Ex. 19 at CF000414. On October 16, 2012, he was subject to an administrative detention order based on an otherwise unspecified

---

[4] While he was at FCI Englewood Mr. Jensen received several incident reports for non-violent conduct that have little bearing on the questions before the Court. However, one report concerned "Destroying Property Over $100, when he admitted damaging a mattress by pulling stuffing out and using it for a homemade pillow." *See* Risk Assessment at PDS000407 (listing disciplinary issues). The government does not assert that Mr. Jensen should be committed because his release would pose a substantial risk of serious damage to another's property, and the record does not show such a risk exists. Therefore, despite the mattress incident, the Court's recommendation of commitment does not rest on any risk of property damage.

5

"threat to [a] judge."[5] *Id.* That same month, Mr. Jensen was transferred to the United States Prison at Terre Haute ("USP Terre Haute"), where a psychologist screening his intake observed that "[h]e does not appear to be a danger to self or others at this time." Ex. A, PDS000164. During the seven months he was at USP Terre Haute, he did not receive a formal incident report but was placed in the special housing unit ("SHU") for taking another inmate's blood pressure medicine. Risk Assessment PDS000398.

Mr. Jensen was frequently moved between facilities during his second federal sentence. Between February 2014 and his January 2016 transfer to FMC Rochester, Mr. Jensen also made threats and engaged in other conduct while at FCI Beckley, USP Atlanta, and FCI Fairton. In September 2014, at FCI Beckley, he "reported to psychology staff he would not return to general population because of concern he would have contact with [two other Native American] inmates, . . . he 'could stab in the neck.'" Risk Assessment PDS000399. A psychology services record regarding this threat observes that "[h]e tends to be very suspicious/paranoid, and will verbally threaten/become hostile with no physical actions taken other than to stalk or harass." Ex. A, PDS000203.

A few months later, Mr. Jensen was transferred to USP Atlanta, and in February 2015 he was placed in the SHU following an incident in which he threatened to hit an unnamed staff member. Risk Assessment at PDS000400; Ex. 21 at CF000367; Ex. 22 at CF000372. Throughout May 2015, Mr. Jensen sent several emails to staff expressing frustration with efforts to "rehabilitate" him and treat his mental illness as he was expecting to be released soon. Ex. A at PDS000259, 264, 266-67, 270; *see also* Risk Assessment at PDS000400. On May 28, 2015, one such email indicated that he was concerned he would "'go out and hurt people' after release" if he did not receive help. Ex. A at PDS000258. Mr. Jensen was again disciplined in July 2015 when he was found with staff members' cellphone numbers, and during the subsequent investigation, he apparently engaged in "escalating threatening and sexually inappropriate behaviors with staff. . . ." Risk Assessment at PDS000401.

The BOP transferred Mr. Jensen to FCI Fairton in November 2015. Risk Assessment at PDS000401. The next month Mr. Jensen wrote a letter to the District of Columbia Chapter of Citizens United for the Rehabilitation of Errants ("CURE")

---

[5] The government states that its "records do not provide any further detail regarding threats [Mr.] Jensen may have made to a judge in October 2012." Gov't's Post Hr'g Br. at 10 n.4.

6

that "contained threats to BOP staff as well as accounts of sexual misconduct towards Mr. Jensen by BOP staff." Ex. 20 at FMCR000350; Risk Assessment at PDS000402. Mr. Jensen "implied he would not hesitate to 'act out' should plans not proceed as he wanted." Risk Assessment at PDS000402.

### C. Conduct After Arriving at FMC Rochester

FCI Fairton referred Mr. Jensen to FMC Rochester for expedited re-designation on January 14, 2016 so that a formal threat assessment could be conducted prior to his release date. Ex. 2 at FMCR000382-83. Since arriving at FMC Rochester, he has three disciplinary reports including: (1) a March 2016 incident in which he refused to comply with a mouth check to ensure he took his medication, Ex. 7 at CF000353; (2) an April 2016 incident in which he again became angry and refused to participate in a mouth check, Ex. 10 at CF000350; and (3) an August 2016 incident in which a razor blade was found during a search of his cell, Ex. 15 at CF000623. In the last of these incidents, Mr. Jensen at first declined to explain why he had the razor blade, but later told staff that he used the razor blade for cutting articles from newspapers and magazines. Ex. 15 at CF000623. Finally, in September 2016, Mr. Jensen told an FMC Rochester nurse, who had been involved in his earlier mouth-check incidents, that he knew personal information about her, which led to his placement in the SHU for several weeks. Tr. 41:20-43:25.

### D. Risk Assessment Panel Opinion

As noted above, a Risk Panel at FMC Rochester recommended that Mr. Jensen be indefinitely committed to the custody of the Attorney General. Risk Assessment at PDS000431. The Risk Panel ultimately concluded that Mr. Jensen's release poses a substantial risk of serious bodily injury to another, and the panel highlighted a number of factors that supported commitment. For example, the Risk Panel was concerned about the 2003 incident leading to his initial federal assault conviction; his threatening communication to his probation officer and former public defender; his behavior while in BOP custody; and his threats to members of the Glory House staff. *Id.* at PDS000425-26.

Other considerations leading the panel members to conclude that Mr. Jensen would present a risk of violence if he is released include his:

1. lack of stable personal relationships;
2. history of problems with education and training programs;
3. history of alcohol and drug abuse;
4. severe mental health issues;

7

5. "history of problems resulting from his fixed and maladaptive personality traits related to his interpersonal style, behavioral controls, emotionality, cognitive style, and sense of self;"
6. experience of several traumatic and harmful events;
7. history of attitudes supportive of violence;
8. history of serious problems complying with mental health treatment.

*Id.* at PDS000426-29.

The panel members also noted Mr. Jensen's lack of insight into his mental defect and mental disease. *Id.* at PDS000429-30. In addition, the Risk Panel considered his ability to adjust if he were released in light of the twelve-month period of supervision that would follow. *Id.* at PDS000430-31. Although he would be on supervised release, the panel members were concerned that Mr. Jensen has made threats about what he might do if released, would not obtain appropriate mental health treatment, would be able to abscond from a community placement, would have access to weapons, and might not be compliant with psychiatric medication. *Id.*

Drs. Gabel and Stanton testified at the hearing. They had both participated in the risk assessment panel, and their testimony was fully consistent with the final Risk Assessment.

### E. Dr. Gilbertson's Analysis and Opinion

The Risk Panel's assessment was not the only evidence from mental health professionals predicting Mr. Jensen's behavior upon release. Dr. James Gilbertson concluded that Mr. Jensen "is at low-moderate risk" of violent re-offense upon release if he remains medication complaint and can "remain recovered," meaning free from alcohol use. Ex. 52 at 20-21; Tr. 212:22-23 (discussing the need for Mr. Jensen to stay recovered from alcohol use). Dr. Gilbertson reached this conclusion about Mr. Jensen's lower risk by applying a risk assessment tool, the Historical Clinical Risk-20, Version 3 ("HCR-20$^{v3}$"), which was also used by the Risk Panel and resulted in similar findings. Tr. 200:9-201:17. His conclusion diverged from the Risk Panel's in part due to his analysis of the historical risk factor of "violent attitudes." *See* Tr. 202:10-203:18; Ex. 52 at 16 (rating "violent attitudes" as "not present" and of "low" relevance). Dr. Gilbertson opined that Mr. Jensen's history of "say[ing] violent things when he's stressed, when he's angry" is not a "large indicator that he's violence prone." Tr. 203:6-13.

8

Dr. Gilbertson also relied upon another instrument known as the Violence Risk Appraisal Guide-Revised ("VRAG-R"), an "actuarial risk instrument that is scored by the examiner based upon largely historical information." Tr. 205:1-7; *see also* Ex. 52 at 17. Using the VRAG-R an examiner assigns a score to an individual based on historical data and compares that score to a grid corresponding to the rate of re-offense for people with similar scores. Tr. 206:24-207:12. Dr. Gilbertson explained that the VRAG-R incorporates a definition of violence that includes non-contact assaults, meaning that it is overbroad for § 4246 analysis because it would statistically capture "violent" behaviors that do not involve bodily injury. *See* Tr. 205:19-206:23. From the actuarial perspective of this instrument, Dr. Gilbertson concluded that Mr. Jensen falls within a category of people for whom the risk of violent re-offense is low. Tr. 207:13-209:2.

Dr. Gilbertson based his conclusions on three major assumptions: (1) that Mr. Jensen would not relapse with chemical dependency issues; (2) that Mr. Jensen would receive mental health treatment; and (3) that Mr. Jensen would remain compliant with medication. Tr. 231:18-232:3. When Dr. Gilbertson prepared his report he was unaware that Mr. Jensen has a history of refusing antipsychotic medications during his time in BOP custody. Tr. 234:18-20. Dr. Gilbertson also acknowledged that after Mr. Jensen's period of supervised release concluded, no judicially imposed conditions on his behavior would remain to foster the environment where his assumptions would be met. *See* Tr. 229:15-230:24.

### III. Discussion

"'Section 4246 provides for the indefinite hospitalization of a [federal prisoner] who is due for release but who, as the result of a mental illness, poses a significant danger to the general public.'" *United States v. Williams*, 299 F.3d 673, 676 (8th Cir. 2002) (quoting *United States v. S.A.*, 129 F.3d 995, 998 (8th Cir. 1997)). To involuntarily commit Mr. Jensen under § 4246, the Court must find that the government has proved, by clear and convincing evidence: (1) that he suffers from a mental disease or defect; (2) because of his mental disease or defect, his release would cause a substantial risk of bodily injury to another; and (3) there is no suitable state placement. 18 U.S.C. § 4246.

Explaining this standard, courts have recognized they are tasked with "'an awesome responsibility to the public to ensure that a clinical patient's release is safe,' . . . [and are] also guided by the fact that the statute imposes a high standard of proof on the Government." *United States v. Chairse*, 18 F. Supp. 2d 1021, 1025 (D. Minn. 1998) (report and recommendation of Mason, M.J., adopted by Kyle, J.) (quoting

*United States v. S.A.*, 129 F.3d 995, 1000 (8th Cir. 1997)). One court considering a § 4246 commitment petition has described the evidentiary standard as follows:

> The "clear and convincing" standard is "demanding." *Spence v. Superintendent*, 219 F.3d 162, 172 (2d Cir. 2000). The Supreme Court has instructed that the standard is met only when a party can "place in the ultimate factfinder an abiding conviction that the truth of its factual contentions are 'highly probable.'" *Colorado v. New Mexico,* 467 U.S. 310, 316 (1984). This standard is satisfied only when "the material [one party] offered instantly tilted the evidentiary scales in [its favor] when weighed against the evidence [the other party] offered in opposition." *Id.*

*United States v. Smith*, 964 F. Supp. 2d 167, 172 (D. Mass. 2013).

Although the burden of proof is high, with its focus on "risk," the statutory standard at issue is inherently probabilistic. *Cf. United States v. Steil*, 916 F.2d 485, 488 (8th Cir. 1990) (discussing, in the context of determining the proper standard of review, that the inquiry the district court engages considers "the potential danger a [person] poses to society") (internal quotations omitted). This means that the government need not establish that bodily injury to others is certain to occur, but rather that there is a "genuine possibility of future harm to persons or property." *United States v. Sahhar*, 917 F.2d 1197, 1208 (9th Cir. 1990).

### A. Mental Disease or Defect and Absence of Suitable State Placement

There is no dispute in this case that Mr. Jensen suffers from a mental disease or defect and that there is no suitable state placement. Resp't's Mem. at 1 ("Mr. Jensen suffers from a mental disease or defect within the meaning of 18 U.S.C. § 4246[.]"); *id.* at 2 ("Mr. Jensen does not dispute that were he committed, there is no suitable state facility within the meaning of § 4246."); Gov't's Mem. at 30-31, 46 (addressing the first and third element of the statute). The government has met its burden to prove these elements by clear and convincing evidence.

Mr. Jensen has been diagnosed with a mental defect—an unspecified neurocognitive disorder. Risk Assessment at PDS000413- 414. The government's experts testified at the hearing that this disorder affects his memory and cognitive functioning as well as his executive decision making and impulse control. Tr. 17:17-21 (Dr. Gabel explaining diagnosis); *id.* at 19:15-25 (Dr. Gabel describing symptoms); *id.* at 120:19-121:1 (Dr. Stanton explaining diagnosis); *id.* at 122:22-125:7 (Dr. Stanton discussing symptoms). He has shown signs of cognitive defects since he was in the

custody of the BOP, and psychological testing over the years has confirmed that conclusion. Tr. 20:1-12.

Mr. Jensen has also been diagnosed with schizoaffective disorder, bipolar type, which is a mental disease. Tr. 17:7-16 (Dr. Gabel noting the diagnosis); *id.* at 121:2-4 (Dr. Stanton noting the diagnosis). Mr. Jensen meets the criteria for schizophrenia and concurrent mood episodes required for such a diagnosis, and he has demonstrated symptoms of this mental disease over the years, such as paranoid and grandiose delusional beliefs, disorganized thoughts, and episodes of depression and mania. Tr. 20:13-23:8 (Dr. Gabel describing basis for the diagnosis); Tr. 125:8-126:7 (Dr. Stanton describing basis for the diagnosis).

The government has also adequately shown that there are no suitable state facilities available in South Dakota to provide Mr. Jensen care. The Warden of FMC-Rochester certified that no suitable state placement exists. Doc. No. 1-2 at 2; Meyer Decl., Ex. B. And Ms. Meyer testified that she worked diligently to find a suitable placement in South Dakota where Mr. Jensen could obtain the treatment he would need, but none were currently available. Tr. 175:15-19; Meyer Decl. ¶¶ 5-6. No evidence in the record contradicts this clear showing and Mr. Jensen does not contend otherwise.

### B. Substantial Risk of Bodily Injury to Another

The parties' dispute in this case centers on whether the government has shown by clear and convincing evidence that Mr. Jensen's release "would create a substantial risk of bodily injury to another person." 18 U.S.C. § 4246. The cases examining this element demonstrate that no individual factor is dispositive of the Court's analysis and the Court must weigh all of the evidence to determine if the standard has been met. Though the record in this case does not demonstrate that Mr. Jensen's release would certainly lead to injury of others, after carefully considering the evidence in favor of commitment and against it, the Court concludes that the government has met its burden to prove that there is a substantial risk that his release would do so. Mr. Jensen's threatening behavior, possession of weapons, and resistance to treatment, even while in highly controlled environments, strongly predicts violence if he were left on his own in the community.

Before discussing the evidence that Mr. Jensen's release would pose the sort of risk contemplated by § 4246, the Court makes the following observation about the applicable legal standard. In several places in the government's memorandum the government refers to evidence as demonstrating Mr. Jensen's "dangerousness." *See, e.g.*, Gov't's Mem. at 32 (referring to "dangerousness"). Such references are

11

understandable; indeed, they mirror the language used in some § 4246 cases. *See, e.g.*, *Ecker*, 30 F.3d at 970. But a consideration of a respondent's "dangerousness" must remain tethered to the plain language of the statute. *See S.A.*, 129 F.3d at 998 ("Our starting point in interpreting a statute is always the language of the statute itself."). However, the statute specifically demands that the government must prove that Mr. Jensen's release would "create a substantial risk of *bodily injury* to another person . . . ." 18 U.S.C. § 4246(a) (emphasis added).[6] Such a focus on the statutory language, rather than the broader concept of "dangerousness" guides this Court's consideration of the evidence.

### *Physically Violent Conduct*

In evaluating the risk of bodily injury to another should Mr. Jensen be released, the Court must consider his history of violent conduct. *See United States v. Ecker*, 30 F.3d 966, 970 (8th Cir. 1994) (listing certain relevant considerations for this element of § 4246 proceedings). As Dr. Stanton testified, it is "very likely" that Mr. Jensen has not physically assaulted anyone in the eighteen months prior to the hearing. Tr. 146:11-147:10. However, on two documented occasions, Mr. Jensen's violent conduct led to another person's bodily injury.

In 2003,[7] Mr. Jensen brandished a knife at his sister and her children and pointed a rifle at tribal officers who responded to the call for help. During the incident, an officer fell off an unfinished landing outside of the residence and hurt his

---

[6] Because the statute requires the government to prove that a persons' release presents a substantial risk of bodily injury to another person, the Court has disregarded testimony at the hearing suggesting that Mr. Jensen may pose a risk of harm to himself if he is released. *See* Tr. 96:8-10 (acknowledging that harm to oneself is not part of the § 4246 analysis); *id.* at 121:24-122:2 (same). In addition, the Court notes that there is no dispute in this case that any risk presented by Mr. Jensen's release would be attributable to his mental disease or defect, so the Court will not explore the element of causation in this discussion.

[7] Prior to 2003, there is no clear and convincing evidence of violent conduct in Mr. Jensen's criminal history, which consists of many misdemeanor offenses like public intoxication, driving under the influence, and possession of marijuana. The Risk Assessment mentions a sexual assault in 1998, but there is no reliable information to support attributing that incident to Mr. Jensen. *See* Tr. 66:6-70:7 (testimony demonstrating the lack of reliable information about the 1998 assault incident).

back. Tr. 61:4-62:1.  Both the age of this incident and the indirect nature of the injury reduce its impact on the Court's prediction of future violence.  A district court must weigh the circumstances surrounding any overt acts and how long ago any such acts occurred in deciding whether the government has met its burden.  *See United States v. Evanoff*, 10 F.3d 559, 563 (8th Cir. 1993) ("[T]he recency or remoteness of any particular activity simply affects the weight the court will give to that particular evidence." (citing *United States v. Sahhar*, 917 F.2d 1197, 1207 (9th Cir. 1990) (remoteness of activity but one factor for court to consider in finding dangerousness under § 4246)).  Nonetheless, Mr. Jensen's brandishing of two deadly weapons during this incident is of grave concern.

The other incident resulting in bodily injury occurred in September 2007, when Mr. Jensen was involved in a fight with another inmate at FCI Englewood.  There, however, the other inmate was undeniably the aggressor, and the evidence shows that he went "out of bounds" to confront Mr. Jensen.  And there is no suggestion that Mr. Jensen's response to the fight he did not start was somehow disproportionate or uniquely violent.  As a result, the Court assigns this incident no weight in the risk calculus.

It is noteworthy that most of Mr. Jensen's disciplinary history in BOP custody did not involve physically violent behavior.[8]  Instead he has been disciplined for offenses such as refusing to obey a correctional officer or being insolent toward BOP staff.  Though such incidents do not weigh heavily in the government's favor, the record also reflects that, even in the controlled environment of prison, Mr. Jensen has received disciplinary reports for making threatening statements to staff.  These incidents are explored in greater detail below.

It is important to note that even where a record contains limited evidence of overt acts of physical violence, as it does here, a district court can still properly find a substantial risk of bodily injury to others if other evidence supports such a conclusion.  *See S.A.*, 129 F.3d at 1001 ("Overt acts of violence are not required to demonstrate dangerousness.") (citing *Ecker*, 30 F.3d at 970).  In this case, Mr. Jensen's threats and threatening behavior, rather than his history of active violence, give rise to much of the Court's concern.

---

[8]  The government characterizes Mr. Jensen's actions of "slamming his fists on a table, turning a table over, and pounding on his cell while in seclusion" as "violent reactions."  Gov't's Mem. at 36.  These outbursts reflect Mr. Jensen's struggles with self-control, which is troubling, but there is no evidence suggesting that his use of physical force was intended to hurt anyone or damage any property.

*Threats, Identified Targets, and Related Behaviors*

The government relies heavily on threatening statements Mr. Jensen has made throughout the last fifteen years. *See* Gov't's Mem. 34-35, 38. The Eighth Circuit has found that threats are relevant considerations in a § 4246 case. *Ecker*, 30 f.3d at 970 (citing *Steil*, 916 F.2d at 487-88, for the proposition that "delusions and threats enough to prove dangerousness even though defendant never had the opportunity to act on them"). In this case, the number of threats, their focused nature, and their consistency throughout the record before the court all demonstrate the risk presented by Mr. Jensen's release.

Since 2003, Mr. Jensen has made many troubling threats and similar statements, including several over the past few years. For instance, while in BOP custody, he threatened to stab two inmates in 2014 at FCI Beckley. He threatened to hit a member of BOP staff at USP Atlanta in 2015. In May 2015, Mr. Jensen expressed frustration about efforts to rehabilitate him and discussed "go[ing] out in a blaze of glory" as he had seen others do while watching the news. Ex. A at PDS000270. In December 2015, Mr. Jensen sent a communication to CURE in which he made "threats to numerous BOP staff members." Ex. 20 at FMCR000350. It appears that Mr. Jensen making threatening statements to staff was common enough, particularly while he was held in SHU, that the threats were at times noted without great detail. Mr. Jensen has also told BOP staff members on more than one occasion that he has obtained their personal information, had verbal outbursts and refused to obey orders during medication mouth checks, and has engaged in behavior the government describes as "stalking." *See* Gov't's Mem. at 38, 40 (citing several incidents in his disciplinary history). It is also noteworthy that some of these threatening statements identified specific targets.

When he was out of custody in 2007, Mr. Jensen made threatening statements to his public defender and his probation officer severe enough to lead to revocation, federal charges, and a subsequent prison term. Similarly, in 2013 he discussed shooting members of Glory House staff while he was on supervised release, leading to revocation. These threats occurred at the same time he was found to have concealed a sharpened butter knife in his property. These incidents demonstrate that a substantial risk of bodily injury to others exists if Mr. Jensen is released rather than committed.

The record contains some suggestions that Mr. Jensen's repeated threats will not inevitably lead to violence. For example, in the September 2014 incident when Mr. Jensen discussed attacking two inmates at FCI Beckley, psychology staff observed that Mr. Jensen's behavioral patterns tend to involve verbal threats and hostility

14

"without physical actions taken other than to stalk or harass." Ex. A at CF000203. Indeed, several BOP records prepared by staff psychiatric examiners frequently rated Mr. Jensen's level of "threat to others" as "low." *See* Ex. A at PDS000018, PDS000033, PDS000059, PDS000071, PDS000109, PDS000149, PDS000157. Despite such mitigating context, these incidents demonstrate that Mr. Jensen resorts to threats and verbal outbursts when he is frustrated or confronted with decisions with which he disagrees. These incidents also show that Mr. Jensen has challenges managing his behavior when he gets upset, and engages in inappropriate conduct that frequently violates social norms. Although these incidents did not escalate to violence, they took place in the highly controlled environment of federal prison. If commitment is denied, Mr. Jensen will no longer be in such a structured setting.

The weight given to Mr. Jensen's history of threatening statements is at the heart of a disagreement between Dr. Gilbertson, Mr. Jensen's expert, and the Risk Panel. Dr. Gilbertson acknowledged that Mr. Jensen says violent things under stress or in moments of anger, but concluded that the historical evidence did not paint a picture of a person who engages in violent acts. *See* Tr. 202:12-203:18. Consistent with that evaluation, in applying the HCR-20$^{v3}$, Dr. Gilbertson determined that the factor of "[v]iolent attitudes" was "not present." Ex. 52 at 16. Had he evaluated the role of the threats differently, the predicted risk presented by Mr. Jensen's release would have been higher. Applying the same tool, the Risk Panel found that Mr. Jensen presented "a history of problems with violence as an adult," and "violent attitudes," rating these as "*definitely or conclusively present.*" Risk Assessment at PDS000417. The Risk Panel focused on evidence of Mr. Jensen's "documented instances of threats towards others" and his behavior during the 2003 incident leading to his initial federal conviction. *Id.*

The Court finds the Risk Panel's analysis of this evidence to be the more compelling view. Though many of Mr. Jensen's concerning behaviors do not involve physical violence, the Court finds it difficult to agree with Dr. Gilbertson that they do not reflect "violent attitudes." The Court has factored into its analysis the evidence that Mr. Jensen has not acted on the specific threats he has made, *see Chairse*, 18 F. Supp. 2d at 1029-30 ("The record here, however, shows that although the Respondent verbally expresses generalized threats as a result of his mental disorder, he does not carry through with them."), but Mr. Jensen's threats contribute to an abiding conviction that Mr. Jensen's release would present a substantial risk of physical injury to another.

*Previous Use and Possession of Weapons*

15

Another relevant consideration in the analysis is whether Mr. Jensen has used weapons in the past. *Ecker*, 30 F.3d at 970. As noted above, Mr. Jensen brandished a knife at his family and pointed a firearm at a law enforcement officer during the 2003 encounter that led to his initial federal conviction. He has also possessed weapons or items that could be used as weapons on other occasions. Particularly concerning was his possession of a sharpened butter knife when he was arrested at Glory House. Mr. Jensen had this weapon during a time when he was threatening to cause physical harm to members of the Glory House staff. More recently at FMC Rochester, BOP staff found a razor blade in his cell. Mr. Jensen's release from custody would only increase his access to weapons and other dangerous items.

As with the entire record, the Court must acknowledge the full context of his history with weapons. Mr. Jensen's possession of a knife at Glory House did not involve the *use* of that knife as a weapon, and he indicated that he was using it as a "tool." Tr. 100:16-25. Similarly, Mr. Jensen did not use the razor blade to attack or menace anyone at FMC Rochester, but to cut articles from newspapers and magazines. However, the Court concludes that Mr. Jensen's history of making threats when combined with a willingness to possess weapons, even in the face of serious discipline for doing so, supports a finding that his release presents a substantial risk of bodily injury to another.

### *Substance Abuse, Medication Compliance, and Lack of Insight*

A respondent's history with drug or alcohol abuse is also relevant to the substantial risk of bodily injury analysis, *Ecker*, 30 F.3d at 970, and Mr. Jensen plainly suffers from a serious problem with alcohol, at a minimum, and perhaps with drugs as well. Alcohol abuse was a significant factor in the 2003 incident in which he threatened his sister and her children and pointed a firearm at a BIA officer. Mr. Jensen also had several driving under the influence convictions and other alcohol related offenses, and over 30 tribal arrests for public intoxication before 2003. Mr. Jensen's overwhelming history of alcohol abuse suggests that the risk of harm he could cause when drinking will increase as barriers to his access to alcohol are removed.

Mr. Jensen has undergone several unsuccessful attempts at alcohol treatment. Risk Assessment at PDS000416. Mr. Jensen points out that during his time in BOP custody, there is evidence of only one violation of prison rules prohibiting use of alcohol or drugs, from June 2007. Ex. A at CF000601; Tr. 59:5-7 (indicating that this

is the only drug or alcohol related incident in the record).⁹  It is true that Mr. Jensen's alcohol abuse disorder is in sustained remission "in a controlled environment."  Risk Assessment at PDS000416.  Nonetheless, though it is possible for inmates to gain access to drugs or alcohol in prison, the Court is mindful that the controlled environment has undoubtedly contributed to Mr. Jensen's relative sobriety while in prison.  *See* Tr. 212:25-213:23 (discussing availability of contraband to inmates within a prison setting).

Also relevant to the § 4246 calculus is whether a respondent has refused to comply with mental health treatment, including medications.  *See Evanoff*, 10 F.3d at 562 (noting that the respondent told psychologists he would refuse any prescribed drugs in favor of taking cocaine should he be released).  The record before the Court regarding Mr. Jensen's adherence to his medication program is mixed.  Since arriving at FMC-Rochester, Mr. Jensen has received incident reports relating to his failure to cooperate with mouth checks that are intended to ensure he has taken his prescribed medication.  Exs. 7, 10; Tr. 29:23-25 (explaining why mouth checks are important).  At the time of the hearing, Mr. Jensen had "been compliant for the longest period" that Dr. Stanton could find in the record, but she described his adherence to be "intermittent."  Tr. 138:16-139:1.  Mr. Jensen did agree, however, to receive a long-acting injection of an anti-psychotic drug¹⁰ that "allowed him to have good consistent adherence," Tr. 139:2-4, and would prevent him from having an "abrupt fall off if he [had] declined medication . . . with oral dosing," *see id.* at 215:9-19.

Mr. Jensen's lack of insight into his mental defect and mental illness also motivated the Risk Panel's assessment that his release would present a risk to others of bodily injury.  *See* Risk Assessment at PDS000429-31.  That lack of insight will contribute to Mr. Jensen's problems with maintaining sobriety outside of a controlled environment, and it makes him resistant to treatment efforts.  *Id.* at PDS000430.  Because he does not recognize that he suffers from a mental illness for which he needs treatment, he is less likely to remain committed to taking medication and attending therapy.

Mr. Jensen's history of alcohol abuse and his inconsistent ability to remain medication compliant amplify the risk of bodily injury to others that is presented by his release.  These concerns are only heightened by the reality of the situation into which he will be released.

---

⁹     The June 2007 incident involved the use of marijuana.  Tr. 59:1-18.
¹⁰    Risperdal is the brand name for the anti-psychotic drug risperidone, Tr. 137:18-21, which is among Mr. Jensen's medications, Ex. 28 at FMCR000526.

### Effect of Supervised Release

The Court has also taken into account the effect a period of supervised release will have on the analysis of risk in Mr. Jensen's case. *See Chairse*, 18 F. Supp. 2d at 1031-32 (considering the existence of special conditions of supervisory release and their reduction of the risk to society posted by the respondent's release). If Mr. Jensen is released, he will be subject to supervision for a one year as a result of the consecutive sentences he received in 2013. Ex. 5 at CF000665-666. One of the "special conditions" of that supervised release period is that he not consume any alcohol. *Id.* at CF000666; Tr. 45:18-20. His special conditions also require him to undergo inpatient/outpatient psychiatric or psychological treatment, to comply with mental health treatment, and to take prescription medications deemed necessary by his treatment provider. Ex. 5 at CF000666; Tr. 106:10-13. Mr. Jensen may also not possess a firearm, ammunition, destructive device, or any other dangerous weapon." Ex. 5 at CF000665.

However, the record is clear that there is no suitable halfway house or other facility where Mr. Jensen could be placed so that these conditions can be enforced or even realistically supported.[11] Even the facility in South Dakota that agreed to a placement indicated that bed space for Mr. Jensen is not available, and this means that "he essentially would be in a homeless shelter" upon release. Tr. 114:13-20; *id.* at 175:15-176:5. Such a living situation only magnifies the risk of bodily injury to others created by Mr. Jensen's release.

Since 2003, Mr. Jensen has been out of the very controlled environment of federal prison on two occasions. The first time he was in the Community Alternatives of the Black Hills release facility, yet threatened to harm his attorney and parole officer, leading to a second federal conviction. The second time he was a resident at Glory House, another residential reentry facility, and in that setting he was again returned to prison for threatening to kill members of the staff, while possessing a sharpened butter knife. Even were such a facility available now, the members of the Risk Panel were concerned that it would provide inadequate support and structure to reduce the risk Mr. Jensen presents. Tr. 107:10-108:1. His release to a homeless shelter would be even worse. Mr. Jensen would not have ready access to the support services he would need to remain medication compliant, obtain mental health

---

[11] During a discussion with Dr. Gilbertson, Mr. Jensen stated that he would be willing to go to a residential facility, and "[h]is hope is that he would get to the point where he could return to his father's home in the Pine Ridge area." Tr. 218:5-13.

18

treatment, and stay sober.  He would also lack the daily contact with mental health professionals the Risk Panel believed was required to ensure he will adjust to life in the community.  Risk Assessment at PDS000430.  Thus, even during his period of supervised release, Mr. Jensen would find himself in an environment where it would be extremely unlikely that the conditions would be present that even Dr. Gilbertson believes are necessary to reduce the risk his release presents.

Though Mr. Jensen has now agreed to intra-muscular dosing of anti-psychotic medications, he made that agreement in a controlled hospital setting at FMC-Rochester.  If he were to be released to a homeless shelter, Mr. Jensen's issues with medication compliance would likely reappear, as his treatment staff at FMC-Rochester observed issues with noncompliance even in a controlled prison setting.  Risk Assessment at PDS000430-31.  The experts all agreed that the risk to public safety would increase if Mr. Jensen began drinking again and if he were to quit taking his prescribed medication.

Given that there is no halfway house placement available to him, the best predictor of Mr. Jensen's likelihood of relapse upon his release is not his history within the BOP or even his prior stays at Glory House and the Community Alternatives of the Black Hills, but rather the period before his 2003 incident when he had a lengthy history of alcohol related offenses.  Both Dr. Stanton and Dr. Gabel testified that they believed Mr. Jensen would be unable to successfully complete twelve months of supervised release without violating the conditions.  *See* Tr. 51:4-24.  Dr. Gabel expressed his apprehension that after a twelve-month supervised release period, Mr. Jensen would not be required to participate in any mental health treatment and supervision whatsoever and "without it his risk for engaging in aggression is substantially elevated."  Tr. 46:13-17.  In light of the reality into which Mr. Jensen would be released, the Court finds this testimony particularly persuasive.

## *Conclusion*

Having weighed all the factors relevant to the question of risk in this case, the Court concludes that the government has met its burden by clear and convincing evidence.  Mr. Jensen has engaged in violent behavior in the past.  He has a lengthy history of making threats, many of which identified specific targets.  He has possessed and brandished weapons in the past, even while in a controlled setting.  Even the more general threats he has made reflect violent attitudes and he has indicated that he thinks of absconding and harming others if he is released.  Mr. Jensen lacks insight into his mental defect, his mental illness, and in particular, the severity of his addictions.  He has been, overall, resistant to treatment.  If he were to be released, Mr. Jensen would be sent to a homeless shelter where he would not have access to the

type of treatment and monitoring needed to reduce the risk his release presents. All of these factors combine to give the Court the abiding conviction that releasing Mr. Jensen will create a substantial risk of bodily injury to another as a result of his mental disease or defect.

## IV. Recommendation

For all the foregoing reasons, the Court concludes that the government has met its burden to prove by clear and convincing evidence that Mr. Jensen must be committed to the custody of the Attorney General under § 4246. Accordingly, the Court recommends that the government's Petition be **GRANTED**.

Date: April 25, 2017

*s/ Katherine Menendez*
Katherine Menendez
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.